# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ALLIED VETERANS OF THE WORLD,
INC.:  AFFILIATE 67, ALLIED
VETERANS OF THE WORLD, INC.:
AFFILIATE 74,**

                    **Plaintiffs,**

**and**

                                        **Case No.  6:11-cv-155-Orl-28DAB**

**PHONE-SWEEPS, LLC, HASSAN SALEM
MALIH d/b/a EMPIRE PHONESWEEP,
JACK'S BUSINESS CENTERS, LLC, and
DARRELL AGOSTINO,**

                    **Intervenor-Plaintiffs,**

**-vs-**

**SEMINOLE COUNTY, FLORIDA,**

                    **Defendant.**

_____

# ORDER

       Plaintiffs and Intervenor-Plaintiffs challenge the constitutionality of Ordinance 2011-1

("the Ordinance"), which was passed by Defendant Seminole County, Florida ("the County")

on January 11, 2011 and which bans "simulated gambling devices" in the County.

(Ordinance, Ex. A to Doc. 1, at 7).  A temporary restraining order was entered on Feburary

1, 2011.  (Doc. 8).  Currently pending are Plaintiffs' Amended Motion for Preliminary

Injunction[1] (Doc. 17) and Intervenor-Plaintiffs' Motion for Preliminary Injunction (Doc. 18).[2] As discussed below, both motions must be denied.

## I.  Preliminary Injunction Standard

In order to obtain a preliminary injunction, a plaintiff must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000).

## II.  Background

Plaintiffs and Intervenor-Plaintiffs Empire PhoneSweep and Jack's Business Centers (collectively "Operator-Plaintiffs") operate internet centers in Seminole County, Florida.[3] (Doc. 17 at 2; Intervenor Compl., Doc. 22, at 34).   The internet centers contain common desktop computers, and Operator-Plaintiffs sell internet time to be used on those computers. (Compl. ¶ 15).   When customers purchase internet time, they also receive a proportional number of entries into a sweepstakes.  (Id. ¶ 22).   The customers are then given plastic

---

[1] Plaintiffs' Motion for Preliminary Injunction (Doc. 3) is denied as moot because it is superseded by Plaintiffs' amended motion.

[2] The County has filed responses to Plaintiffs' and Intervenor-Plaintiffs' motions (Docs. 26 & 33), and the parties made oral arguments on the motions on Feburary 17, 2011.

[3] Intervenor-Plaintiff Darrell Agostino is the owner of Jack's Business Centers, and Intervenor-Plaintiff Phone-Sweeps, LLC develops software that is utilized in the sweepstakes games played at internet centers.

account cards that contain a "magnetic strip with an electronically encoded, personal identification number (PIN)." (Id. ¶ 21).

When a customer swipes the account card at a terminal, "the card electronically transmits the customer's PIN to the computer" and the customer can then either access the internet or find out whether he won the sweepstakes. (Id. ¶¶ 27-28). The customer has three options to find out whether he won the sweepstakes: he can ask the cashier; he can use the "quick reveal" option on the computer, which "simply displays by alphanumeric text the results of each entry without fanfare"; or he can he can play a video simulation of a casino game–for example a video slot machine. (Id. ¶¶ 28-29). Playing the game does not affect the outcome of the sweepstakes; it is merely an entertaining method of delivering the results. (Id. ¶ 29). If the customer wins the sweepstakes, he is entitled to a prize.

In response to the "increasing proliferation" of such internet centers, (Ordinance at 1), the County enacted the Ordinance, which makes it illegal for "any person to design, develop, manage, supervise, maintain, provide, produce, possess or use one or multiple simulated gambling devices," (id. at 7). The Ordinance defines a "simulated gambling device" as "any device that, upon connection with an object, is available to play or operate a computer simulation of any game, and which may deliver or entitle the person or persons playing or operating the device to a payoff." (Id. at 5). The Ordinance then goes on to define nearly every word contained in the definition of "simulated gambling device." The definitions are cumulative; every condition provided must be met for something to qualify as a "simulated gambling device."

The first part of the definition requires that a person "connect" an "object" to a "device."  A "device" is "any mechanical or electrical contrivance, computer, terminal, video or other equipment that may or may not be capable of downloading games" and includes "any associated equipment necessary to conduct the operation of the device."  (<u>Id.</u>).  An "object" is "a coin, bill, ticket, token, card or similar object, obtained directly or indirectly through payment of consideration, or obtained as a bonus or supplement to another transaction involving the payment of consideration."  (<u>Id.</u>).  The "connection" that must be made between the two can be an "insertion, swiping, passing in range, or any other technical means of physically or electromagnetically connecting."  (<u>Id.</u>).

Once the connection is made, the device must make "a computer simulation"[4] of a "game" available to "play or operate."  The definition of "game" under the ordinance includes "slot machines, poker, bingo, craps, keno, [or] any other type of game ordinarily played in a casino," and "a game involving the display of the results of a raffle, sweepstakes, drawing, contest or other promotion, lotto, [or] sweepstakes" and "any other game associated with gambling or which could be associated with gambling."  (<u>Id.</u> at 6).  Playing or operating the computer simulation of a game "includes the use of skill, the application of the element of chance, or both."  (<u>Id.</u> at 5).  Finally, a "payoff" is defined as "cash, monetary or other credit, billets, tickets, tokens, or electronic credits to be exchanged for cash or to receive

---

[4]A "'computer simulation' includes simulations by means of a computer, computer system, video display, video system or any other form of electronic video presentation." (Ordinance at 5).

merchandise or anything of value whatsoever, whether made automatically from the machine or manually." (Id. at 6).

To illustrate, it is helpful to examine how Operator-Plaintiffs' activities fit within the context of the Ordinance.  Operator-Plaintiffs' computers (devices) are, upon swiping (connecting) an account card (object), available to play (utilizing skill and/or chance) a computer simulation of casino games (for example, a slot machine), which may entitle the player to a payoff (for example, cash) for winning the sweepstakes.

## III.  Analysis

Plaintiffs and Intervenor-Plaintiffs claim that the Ordinance violates the United States Constitution in several ways and that they will suffer irreparable injury if the County is allowed to enforce the Ordinance.  First and foremost, they claim that the Ordinance violates the First Amendment.  Plaintiffs and Intervenor-Plaintiffs also argue that the Ordinance is void for vagueness, violates the dormant Commerce Clause, and imposes fines and penalties on a strict liability basis without the requisite showing of a "responsible relationship" in violation of the Due Process Clause.  (Doc. 17 at 14; see generally Doc. 18).  As discussed below, Plaintiffs and Intervenor-Plaintiffs have not shown that they have a substantial likelihood of success on the merits of their claim, and therefore the motions for preliminary injunction will be denied.

### A.  First Amendment

Plaintiffs and Intervenor-Plaintiffs assert that the Ordinance violates the First Amendment as applied to them because it is a content-based restriction on speech and that it violates the First Amendment on its face because it is overbroad.  However, the statute

regulates conduct rather than speech, and therefore, Plaintiffs and Intervenor-Plaintiffs have not shown a substantial likelihood of success on their First Amendment challenges.

The Temporary Restraining Order issued on February 1, 2011 (Doc. 8) concluded that at least some video games constitute protected speech and that Plaintiffs therefore had made a showing that they were entitled to a temporary restraining order.  Although the Order correctly determined that video games can constitute protected speech, a thorough examination of the parties' arguments and of the Ordinance yields the conclusion that the Ordinance does not prohibit that protected speech.  Instead, the Ordinance prohibits only conduct.

### 1.  As Applied to the Operator-Plaintiffs

Operator-Plaintiffs argue that along with the video games played at their establishments, their patrons' access to the internet is protected speech and the Ordinance bans such speech.  However, the Ordinance in no way prohibits access to the internet; it only regulates the simulated gambling devices.  Furthermore, although the games played at Operator-Plaintiffs' establishments may constitute protected speech, the Ordinance only bans the games if all elements of the definition of "simulated gambling device" are present. As noted above, a device must entitle the player to the possibility of a payoff in order to constitute a "simulated gambling device."  None of the video games at issue is banned on its own–only the playing of such a game *in conjunction* with the possibility of a payoff is banned.  Therefore, Operator-Plaintiffs are free to provide the video games to their patrons and their patrons are free to play them–and thus make and receive whatever protected

message is communicated by the video game–so long as the games are not associated with the conduct of a payoff.[5]

Operator-Plaintiffs also argue that the Ordinance bans speech that is "associated with gambling."  This argument takes the Ordinance out of context.  The "associated with gambling" language is part of the definition of "game."  A "game" as defined by the Ordinance includes games that are, or could be, associated with gambling.  The Ordinance in no way bars all speech associated with gambling; it only bans *games* associated with gambling *if* those games also provide the possibility of a payoff.

## 2.  As applied to Phone-Sweeps LLC

Intervenor-Plaintiff Phone-Sweeps LLC ("Phone-Sweeps") "creates, develops, and maintains the computer software utilized by [Empire PhoneSweep and Jack's Business Centers]."  (Doc. 18 at 2).  Phone-Sweeps argues that the computer code used in its computer software is protected speech, which the Ordinance unconstitutionally bans.

As an initial matter, it is unclear whether the computer code contained in Phone-Sweeps's software is, indeed, protected speech.  Although some courts have determined that  computer code can constitute protected speech in certain circumstances, such code is not always protected.  Instead, because computer code can communicate both to humans and to computers, the way in which the code is utilized is relevant.  There are three general "ways in which a programmer might be said to communicate through code ": (1) to the user of the program, which is not necessarily protected; (2) to the computer, which is never

---

[5] Operator-Plaintiffs also assert that they are engaged in "expressive" conduct, but they do not provide any support for such an argument.

protected; and (3) to other programmers, which is likely protected.  <u>Universal City Studios, Inc. v. Corley</u>, 273 F.3d 429, 449 (2d Cir. 2001).

In <u>Universal City Studios</u>, the Second Circuit recognized that "[i]nstructions such as computer code, which are intended to be executable by a computer, will often convey information capable of comprehension and assessment by a human being."  <u>Id.</u> at 448.  For example, "[a] programmer reading a program learns information about instructing a computer . . . [and] programmers communicating ideas to one another almost inevitably communicate in code, much as musicians use notes."  <u>Id.</u>  In such cases, the code is protected speech. However, "where a human's mental faculties do not intercede in executing the instructions," there is no First Amendment protection.  <u>Id.</u> at 448 n.20 (citing <u>Commodity Futures Trading Comm'n v. Vartuli</u>, 228 F.3d 94, 111 (2d Cir. 2000)).

Nowhere does Phone-Sweeps assert that it uses its code to communicate with other programmers or even that the user of the software may interpret the code.  It appears that Phone-Sweeps utilizes its code only to communicate with the computer.

Moreover, even if Phone-Sweeps's software were protected speech, the software–alone–does not constitute a simulated gambling device and therefore is not banned by the Ordinance.[6]  The software cannot display itself, and it cannot provide a payoff.  If a person utilized the software in conjunction with all of the other elements of a simulated gambling device then that person would be liable under the Ordinance, but the software, in and of itself, cannot constitute a simulated gambling device.  Accordingly, because the

---

[6] Neither the Plaintiffs nor the Intervenor-Plaintiffs allege that they design the entire simulated gambling device.

-8-

software on its own is not a simulated gambling device, designing the software is not a violation of the Ordinance.  Phone-Sweeps has not shown a substantial likelihood of success on its as-applied First Amendment challenge.

### 3.  Overbreadth

Plaintiffs and Intervenor-Plaintiffs argue that even if the Ordinance is not unconstitutional as applied to them, it is facially unconstitutional because it is overbroad.

Normally, "to challenge a statute facially, 'the challenger must establish that no set of circumstances exists under which the Act would be valid.'" Fla. Ass'n of Prof'l Lobbyists, Inc. v. Div. of Legislative Info. Servs. of the Fla. Office of Legislative Servs., 525 F.3d 1073, 1079 n.7 (11th Cir. 2008) (quoting United States v. Salerno, 481 U.S. 739,745 (1987)).  However, "[t]he First Amendment doctrine of overbreadth is an exception to the normal rules governing facial challenges."  Id. at 1079 (citing Virginia v. Hicks, 539 U.S. 113, 119 (2003)).  For a law to be declared invalid under the overbreadth doctrine, the law's "application to protected speech [must] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications."  Hicks, 539 U.S. at 119-120 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)).  The Supreme Court has described the overbreadth doctrine as "strong medicine" and has cautioned that it should be used "sparingly and only as a last resort."  Broadrick, 413 U.S. at 613.  This is because an overbroad law is declared unconstitutional in its entirety even if it could be legitimately enforced in some situations "unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression."  Id.  Also, although the possibility that an overbroad law will chill constitutionally protected speech is an important

consideration, "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, **or especially to constitutionally unprotected conduct**." Hicks, 539 U.S. at 119 (italicized emphasis in original, bold emphasis added).  Accordingly, "there comes a point at which the chilling effect of an overbroad law . . . cannot justify prohibiting all enforcement of that law–particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" Id.

Plaintiffs have posited several different scenarios that allegedly demonstrate that application of the Ordinance punishes constitutionally protected speech.  However, when each is examined, it is clear that the Ordinance would either not apply in the scenario or its application would be constitutional.

First, Plaintiffs argue that promotions like "my coke rewards"[7] and games like those played at Chuck E. Cheese[8] would be prohibited by the Ordinance.  Even assuming that these games would constitute simulated gambling devices,[9] the Ordinance's application to

---

[7] To play my coke rewards, an individual purchases a qualifying beverage and obtains the code that is printed somewhere on the packaging.  My Coke Rewards, How It Works, http://www.mycokerewards.com/howItWorks.do?WT.ac=mnuHIW_PO (last visited May 5, 2011).  The individual then creates an account on the website and enters his or her code to get points.  Id.  Those points can then be used to, among other things, enter sweepstakes or instantly win.  Id.

[8] The games Plaintiffs refer to are those that require a player to purchase a token, insert the token into the game, and receive tickets for playing.  (Charles Lee Black Aff., Ex. I to Compl., ¶¶ 3-7).  The tickets can then be redeemed for merchandise.  (Id. ¶ 7).

[9] It is unclear whether either of these would constitute a simulated gambling device.  The Court is not aware of any games–as defined by the Ordinance–available through my coke rewards.  Additionally, the Chuck E. Cheese games may fall within the exception for

these games–like its application to Operator-Plaintiffs' games–only prohibits conduct.  Coke and Chuck E. Cheese would still be free to communicate the same messages as long as there was no possibility of a payoff.  Plaintiffs seemingly argue that because my coke rewards and Chuck E. Cheese are outside the *conduct* that the County stated it was intending to regulate, the Ordinance is overbroad.  This, however, is obviously not the same kind of "overbreadth" that makes a law violative of the First Amendment.

Next, Plaintiffs claim that the Ordinance would unconstitutionally punish people who play World of Warcraft ("WOW") and "develop virtual characters for later sale or trade." (Doc. 17 at 18).  WOW is a "Massively Multiplayer Online Role-Playing game" where "players from around the world assume the roles of heroic fantasy characters and explore a virtual world full of mystery, magic, and endless adventure."  World of Warcraft, Beginner's Guide, http://us.battle.net/wow/en/game/guide/ (last visited May 5, 2011).  Plaintiffs argue that all elements of a simulated gambling device are present when someone plays WOW and then sells or trades the digital products accumulated while playing.  However, it is likely that WOW would fall within the Ordinance's exemption for "an individual's personal, recreational, and non-commercial ownership, possession, play, operation or use of a device which could be construed to be a simulated gambling device."  (Ordinance at 7).

Even if it did not fall within the exemption, WOW would not be prohibited by the Ordinance. Although WOW does utilize a "device" because it is played on a computer, Plaintiffs have not shown that the device has to be connected with an "object" in order to play

---

devices expressly permitted by the Florida Statutes.

WOW or that WOW itself falls within the definition of "game." As previously noted, an "object" is "a coin, bill, ticket, token, card or similar object, obtained directly or indirectly through payment of consideration, or obtained as a bonus or supplement to another transaction involving the payment of consideration." (Id. at 5). Plaintiffs apparently would like the Court to ignore the definition provided within the Ordinance and consider the direct entry of a credit card number into a computer in order to play WOW as satisfying the "object" requirement. This is clearly contrary to the plain language of the Ordinance.

Furthermore, the Plaintiffs attempt to separate the consideration aspect from the rest of the definition of "object" and argue that because individuals must pay to play WOW, the "object" requirement is satisfied. The mere fact that an individual must pay to play a game is insufficient to deem the game a simulated gambling device. Rather, an individual must obtain a coin, bill, ticket, token, card or similar object through the payment of consideration, and that coin, bill, ticket, token, card or similar object must then be inserted, swiped, passed in range, or otherwise physically or electromagnetically connected to the computer. Therefore, under the terms of the Ordinance the consideration must relate to obtaining the object–not to playing the game.

Additionally, Plaintiffs argue that WOW falls within the definition of "game" because it involves the elements of chance and skill. However, the elements of chance and skill are part of the definition of "play or operate," not the definition of game. WOW does not fall within the definition of game because it clearly is not a "slot machine, poker, bingo, craps, keno, or any other type of game ordinarily played in a casino," nor is it "a game involving the display of the results of a raffle, sweepstakes, drawing, contest or other promotion, lotto, [or]

sweepstakes."  A determination that WOW is a game that is "associated with gambling or which could be associated with gambling" would be an unreasonable reading of the Ordinance.

As their last example, Plaintiffs argue that the Ordinance is unconstitutionally overbroad because it bans viewing the results of the lottery or other sweepstakes, or communicating about the results of any "game" as defined by the Ordinance, over the internet.  Again, Plaintiffs fail to recognize that every element of the definition of "simulated gambling device" must be present in order for an activity to be prohibited.  Using a computer to view the results of a lottery or to communicate about the results of a "game" would not constitute using a simulated gambling device because the computer is not simulating any game.  Although the definition of "game" includes games that involve "the display of the results" of the lottery, simply viewing the winning lottery numbers is not a *game that displays* the results; it is just the results.  Similarly, discussing the results of a game does not constitute playing a game.

Plaintiffs attempt to further confuse the issue by arguing that because the Ordinance regulates "legal" conduct, it is overbroad.  All parties concede that the Ordinance regulates more than just gambling, and Plaintiffs assert that–but for this Ordinance–their conduct would be legal because it is not gambling.[10]  This assertion is entirely irrelevant.  If legislative bodies were prohibited from regulating previously unregulated conduct, nearly every new law would

---

[10] The County disputes this assertion but argues that even if it were true, the Ordinance constitutionally regulates Plaintiffs' and Intervenor-Plaintiffs' conduct.

be declared unconstitutional.  Such an absurd result is clearly not contemplated by the overbreadth doctrine.

Finally, Intervenor-Plaintiffs argue that this case is controlled by <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234 (2002).  In <u>Ashcroft</u>, a statute banning "simulated" child pornography was declared unconstitutional.  The Supreme Court held that while "actual" child pornography was obscenity, and therefore unprotected speech, "simulated" child pornography was not obscenity and could not be prohibited merely because of its similarities to "actual" child pornography.  Intervenor-Plaintiffs argue that <u>Ashcroft</u> applies here and that the County is not allowed to prohibit "simulated" gambling merely because it is allowed to regulate "actual" gambling.  However, the use of the word "simulated" is where the similarities between <u>Ashcroft</u> and the instant case end.  In <u>Ashcroft</u>, the simulated child pornography was not protected merely because it was "simulated"; it was protected because it constituted protected speech.  As discussed above, the Ordinance here prohibits conduct–not speech.

## B.  Vagueness

Plaintiffs also challenge the Ordinance on vagueness grounds.[11]  They argue that the terms "simulated gambling device," "game," "use," "game ordinally played in a casino," and "any other game associated with gambling or which could be associated with gambling" are unconstitutionally vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972).

---

[11] Intervenor-Plaintiffs make no separate vagueness argument, but they adopt Plaintiffs' arguments.

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)).

It is also a "well-established rule of constitutional law . . . that a party 'to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations.'" United States v. Di Pietro, 615 F.3d 1369, 1371 (11th Cir. 2010). This rule "avoids an undesirable foray by federal courts into 'every conceivable situation which might possibly arise in the application of complex and comprehensive legislation' . . . [and] it ensures that federal courts make informed judgments by limiting their decisions to actual, not hypothetical, cases that carry with them facts and data on which a well-reasoned decision may be based." Id. at 1372 (internal citations omitted). Under the vagueness doctrine, this means that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982). This rule holds true even in the context of a First Amendment challenge. Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2719 (2010) ("[E]ven to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others.").

In sum, Plaintiffs cannot raise a successful vagueness claim because their conduct is clearly proscribed by the Ordinance.  In fact, Plaintiffs do not even attempt to argue that the statute is vague as applied to them.  Rather, Plaintiffs argue that the exceptions in the Ordinance–which they do not assert apply to them–are vague and that some of the definitions are vague on their face. (Doc. 17 at 20-21).  Plaintiffs also attempt to merge their overbreadth argument with their vagueness argument by stating that the definition of "game" implicates a wide variety of protected speech. (Id. at 21).  However, "a Fifth Amendment vagueness challenge does not turn on whether a law applies to a substantial amount of protected expression. Otherwise the [vagueness and overbreadth] doctrines would be substantially redundant." Humanitarian Law Project, 130 S. Ct. at 2719 (internal citations omitted).

### C.  Unconstitutionally Underinclusive

Plaintiffs and Intervenor-Plaintiffs argue that the Ordinance is unconstitutionally underinclusive because it "discriminates against electronic communication in favor of 'traditional' paper communication" and because it "discriminates against 'commercial' in favor of 'non-commercial' behavior." (Doc. 17 at 22; Doc. 18 at 11).  However, because the Ordinance does not infringe on Constitutionally protected rights, the County must only have a rational basis for regulating commercial electronic simulated gambling as opposed to non-commercial or paper simulated gambling. Romer v. Evans, 517 U.S. 620, 631 (1996) ("[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.").  As conceded by Plaintiffs during oral argument, the County's stated basis–to protect the public

-16-

from the deceptive nature of commercial electronic simulated gambling devices–satisfies the rational basis requirement, and therefore the statute is not unconstitutionally underinclusive.

### D.  Dormant Commerce Clause

"The Dormant Commerce Clause prohibits 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" Cachia v. Islamorada, 542 F.3d 839, 842 (11th Cir. 2008) (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273 (1988)).   "To determine whether a statutory scheme violates the dormant Commerce Clause, [the Court] employ[s] two tiers of analysis." Bainbridge v. Turner, 311 F.3d 1104, 1108 (11th Cir. 2002) (citations omitted).   First, the Court "must determine whether the [] law discriminates against out-of-state residents on its face." Locke v. Shore, 634 F.3d 1185, 1192 (11th Cir. 2011).   If it discriminates facially, "the regulation must be shown to 'advance[ ] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" Cachia, 542 F.3d at 842 (quoting Bainbridge, 311 F.3d at 1109).   On the other hand, "[i]f a regulation is directed equally at interstate and local businesses, and has 'only indirect effects on interstate commerce,' [the Court] 'examine[s] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.'" Id. (quoting Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579 (1986)).

The Ordinance does not discriminate on its face.  It regulates evenhandedly and applies to local, in-state, and out-of-state interests equally.  Therefore, the Court must determine whether the Ordinance has a discriminatory impact.

"The Supreme Court has emphasized several factors which guide [courts] in determining whether a neutrally-worded state law has a discriminatory impact": (1) "whether the state law 'exclude[s] a class of predominantly out-of-state [residents],'" Locke, 634 F.3d at 1193 (quoting Exxon Corp. v. Governor of Md., 437 U.S. 117, 137 (1978)); (2) "whether the state statute imposes costs on out-of-state residents that in-state residents do not have to bear," id. (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 352-53 (1977)); and (3) "whether the state legislature was motivated by protectionist purposes in passing the law at issue," id. (citing Granholm v. Heald, 544 U.S. 460, 472 (2005)).  None of these factors is present here.  Rather than impacting out-of-state interests more than in-state interests, the largest impact of the ordinance is wholly in-state.  Intervenor-Plaintiffs argue that the Ordinance unreasonably burdens the dissemination of speech via the internet, but as discussed above, the Ordinance does not impact the dissemination of speech.  Accordingly, Plaintiffs and Intervenor-Plaintiffs have failed to show that they have a substantial likelihood of success on the merits of their dormant Commerce Clause claim.[12]

### E.  "Responsible Relationship" under the Due Process Clause

Plaintiffs and Intervenor-Plaintffs argue that the Ordinance is unconstitutional because it lacks a mens rea requirement and imposes vicarious liability without requiring a showing of a "responsible relationship" between the defendant and the person committing the act.  However, on its face, the Ordinance does not impose vicarious liability; it only makes

---

[12] The County also argues that the statute does not apply to interstate commerce because it does not implicate the use of the internet.  In light of the discussion in the text, the Court need not address this argument.

individuals liable for their own actions.  Plaintiffs' and Intervenor-Plaintiffs' reliance on <u>Lady J. Lingerie, Inc. v. City of Jacksonville</u>, 176 F.3d 1358 (11th Cir. 1999), is inapposite.  The ordinance at issue in <u>Lady J. Lingerie</u> specifically stated that "[a]ll acts of any servant, agent, or employee, paid or unpaid, of an owner shall be imputed to the owner and be deemed to be an act of the owner if done within the scope of such servant, agent or employee's scope of authority under the owner."  <u>Id.</u>  The Ordinance in this case contains no such language. It makes people liable for their own acts of managing, supervising, and maintaining simulated gambling devices, but nowhere does the Ordinance imply that owners or managers will be liable for the acts of third parties.  (Ordinance at 7).

Plaintiffs have also failed to show that the Ordinance's lack of a specific mens rea requirement violates the Due Process Clause.  <u>See</u> <u>Humanitarian Law Project v. U.S. Treasury Dep't</u>, 578 F.3d 1133, 1152 (9th Cir. 2009) ("[The] civil penalties [at issue] may be imposed without *mens rea* requirements because they are indeed civil."); <u>Northern Wind, Inc. v. Daley</u>, 200 F.3d 13, 19 (1st Cir. 1999) ("As a general matter, scienter is not required to impose civil penalties for regulatory violations when the regulation is silent as to state of mind."); <u>State v. Oxx</u>, 417 So. 2d 287, 290 (Fla. 5th DCA 1982) (holding that the criminal statute at issue did not violate the Due Process Clause even though it did not expressly require mens rea because it "describe[d] a crime *malum prohibitum*, not *malum in se*"; it did not "appear to chill a person's exercise of his or her first amendment rights"; and it "punishes certain affirmative acts, not a failure to act," and "proof of an act [raises] a presumption that it was knowingly and intentionally done").

**IV.  Conclusion**

In accordance with the foregoing, it is **ORDERED** that Plaintiffs' Amended Motion for Preliminary Injunction (Doc. 17) and Intevenor Plaintiffs' Motion for Preliminary Injunction (Doc. 18) are **DENIED**, and Plaintiffs' Motion for Preliminary Injunction (Doc. 3) is **DENIED as moot**.  It is further **ORDERED** that the Temporary Restraining Order issued on Feburary 1, 2011, is no longer in effect.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 6th day of May, 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party